

FILED
NOV 06 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \* | |
| | \* | CR 17-40029 |
| Plaintiff, | \* | |
| | \* | |
| vs. | \* | MEMORANDUM OPINION AND |
| | \* | ORDER ON DEFENDANT'S |
| | \* | MOTION TO SUPPRESS, DOC. 31 |
| THOMAS RAYMOND McCLELLAND | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Defendant's Motion to Suppress, Doc. 31, seeking to suppress all tangible evidence seized from Defendant's vehicle following a traffic stop for speeding and for suppression of other evidence derivative of the search, including his post-arrest statements. Defendant argues the traffic stop was unconstitutionally prolonged for lack of reasonable suspicion when a drug-detection dog was deployed after the issuance of a speeding ticket. In the alternative, Defendant further argues that, even if reasonable suspicion did exist, the drug dog's positive indication did not provide probable cause to conduct the search of the Defendant's vehicle. Argument was heard with all counsel present on October 13, 2017 and for the reasons set forth herein, Defendant's Motion is denied.

## FACTUAL BACKGROUND

On September 12, 2016, Officer John Badker, a Mitchell, South Dakota K-9 officer, had received information from fellow law enforcement that a white 2015 Chrysler 200 with a Georgia license plate was possibly transporting illegal contraband. That information was relayed from a K-9 officer in Utah to South Dakota Highway Patrol Trooper John Lord, who subsequently informed Ofc. Badker. Later in the evening, Ofc. Badker observed a vehicle matching the description traveling at a speed of 84 mph in an 80 mph zone and initiated a traffic stop. The license plate on the vehicle was a California plate, not a Georgia plate, and upon

further inquiry during the stop, the other members of law enforcement who had relayed the previous information made a correction stating the suspected vehicle indeed had a California license plate. The driver of the car was identified as Defendant, Thomas Raymond McClelland, a retired K-9 officer.

Upon approaching the vehicle, Ofc. Badker informed Defendant of the reason for the stop. Defendant explained that he had been looking down at his phone at a text message and not paying attention. Ofc. Badker asked Defendant to come back to his vehicle and Defendant indicated he would. He put his shoes on and started walking back to the vehicle when Ofc. Badker asked if he "had anything on him." Defendant responded by lifting his arms above his head, revealing a concealed pistol on his hip. Ofc. Badker removed the pistol and Defendant informed the officer that he had a concealed carry permit. While in Ofc. Badker's vehicle, Defendant provided Ofc. Badker with the rental agreement for the vehicle and explained that he had flown out to California to see a couple old friends. Upon finding out that his dog was sick, he wanted to get home right away. He explained that he did not fly home because last minute flights are prohibitively expensive, but conceded that the one-way rental ended up costing him about as much. When asked when he started driving back, Defendant initially stated he left the previous morning. After second thought, he stated he had left the day before that. The rental agreement, however, provided that the car was rented on September 9th—three days prior.

Ofc. Badker asked Defendant if he had any weapons in the vehicle. Defendant paused and said, "umm…I don't think so." Ofc. Badker asked if he didn't think so or if he knew there weren't any other weapons in the vehicle, to which Defendant replied, "no, I got my suitcase which is a carry on." As Ofc. Badker continued to fill out the citation, he asked Defendant if there was anything illegal in the car. Defendant stated there was not. Ofc. Badker asked if he "wouldn't mind if we checked just to make sure?" Defendant stated he would mind, and didn't think he needed a ticket either. When Ofc. Badker pointed out that an officer would normally find the circumstances of the one-way rental from California to South Dakota suspicious, Defendant concurred, saying "the only thing that would be better was if a third party rented it." Then Defendant emphatically stated that there was "no dope in the fricken car though, I can tell you that much." Ofc. Badker then indicated that he was "going to run my dog to be sure, okay?" Defendant responded, saying, "Go ahead, yeah, that's cool. I want to see your dog anyway." Ofc.

2

Badker asked a final time if there was anything else in the vehicle "besides the bag up front." Defendant indicated there was "nothing bad."

Upon completing the ticket, Ofc. Badker exited the patrol vehicle and deployed his drug dog, Shadow, who had been caged in Ofc. Badker's vehicle. The body camera video entered into evidence shows Shadow is on a leash, but is clearly a lot to handle, as he pulls Ofc. Badker toward Defendant's vehicle. Shadow sniffs along the passenger side, circles around the front, where he stops briefly to sniff intensely at the front license plate, then ducks under the front driver side panel before sniffing along the driver's side. Shadow turns left along the back of the driver's side and eventually sits down at the trunk "indicating" that he has found the source of the odor. Shadow appears disinterested at this point, looking out to his left toward the cars passing on the interstate. Ofc. Badker testified that at this point he tried to get Shadow to focus by pointing toward the vehicle, showing him where he wants him to sniff. Shadow stands again and moves toward the vehicle, then sits. Again Shadow stands and moves toward the vehicle, this time moving toward the right and away from the vehicle, still on the leash, and heads back toward Ofc. Badker's police cruiser. Ofc. Badker testified that he had then "cheated Shadow off the scent," by showing Shadow a closed fist where the dog believes the origin of the scent now is, then opening his hand to "release the scent." Defendant, however, asserts that Ofc. Badker cued Shadow to indicate by moving around to stand in front of the dog, pointing at the car, and using a toy to either point at the car or at least reward the dog afterward. Ofc. Badker testified that he did not use the toy, though he did have it on his person. At the end of the video however, Shadow runs up to the Trooper who had shown up on scene. Then, after putting Shadow back in his cage, the Trooper can be seen handing the toy to Ofc. Badker and Ofc. Badker subsequently places the toy in the back of his police vehicle.

When Ofc. Badker informed Defendant that Shadow had indicated so he was now going to search the vehicle, Defendant stated, "we both know you can't make your dog indicate." Defendant asserts, "you sat there and went like this" while tapping on the dash board of the vehicle. Ofc. Badker responded saying he was not going to argue with him and conducted a search of the vehicle. No illegal drugs or drug-related paraphernalia were found during the search. However, several firearms were located, including two that are alleged to be machine guns, resulting in Defendant's arrest.

3

Defendant has moved to suppress evidence obtained from the search, stating there was no reasonable suspicion to conduct the dog sniff. In the alternative, Defendant argues that even if there was reasonable suspicion, the indication by the dog was cued or otherwise unreliable and therefore did not give Ofc. Badker probable cause to conduct the search. In response, the Government asserts that reasonable suspicion was not even necessary, as Defendant consented to the dog sniff. Alternatively, the Government argues that the totality of the circumstances presented Ofc. Badker with reasonable suspicion and the dog sniff was reliable and provided probable cause for the search.

## ANALYSIS

### REASONABLE SUSPICION

> [A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

*Rodriguez v. United States*, 135 S.Ct. 1609, 1612 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Therefore, absent reasonable suspicion, police may not extend an otherwise-completed traffic stop to conduct a dog sniff. *See id.* at 1614.

The Government first maintains that Defendant consented to the dog sniff when he said "Go ahead, yeah, that's cool. I want to see your dog anyway" after Ofc. Badker stated he was "going to run my dog to be sure, okay?" However, "simply telling a police officer to 'go ahead' with a search is not, in and of itself, proof of voluntary consent." *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004) (citing *United States v. Morgan*, 270 F.3d 625, 631–32 (8th Cir. 2001)). Instead, the Government must illustrate more than mere acquiescence to a claim of lawful authority in order to discharge its burden of showing consent was freely and voluntarily given. *See id.* at 785. The Government has not met that burden in this case. It is clear from the video presented at the hearing that Defendant did not have a choice but to acquiesce to Ofc. Badker's statement that he would be conducting a dog sniff. Ofc. Badker even testified on cross-examination that his mind was made up and that he would be conducting the dog sniff regardless of Defendant's answer. Accordingly, without valid consent, reasonable suspicion was required for a valid continuation of the stop to conduct the dog sniff.

4

In assessing whether reasonable suspicion exists, the Court must determine whether the particular facts known to the police officer, together with any rational inferences from those facts, under the totality of the circumstances, amount to an objective and particularized basis for suspicion that a crime was being committed. *See United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Thus, "factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011). Further, the Court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988) (citing *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983)).

Here, the Government contends that reasonable suspicion for Defendant's continued detention to conduct the dog sniff arose from the following circumstances: (1) a Utah law enforcement officer who had stopped Defendant previously had called ahead to say he thought Defendant may be transporting contraband; (2) Defendant was quick to bring up his history as a police officer and that he was in contact with another law enforcement officer at the time; (3) Defendant displayed general nervousness throughout the stop; (4) Defendant was traveling by a rental vehicle rented for a one-way trip to South Dakota from California, a place known for distributing narcotics; (5) Defendant was unsure of the date of his departure and gave an unusual or suspicious reason for traveling via a one-way rental vehicle; (6) Defendant gave evasive answers when questioned about the presence of weapons and other illegal materials in the car; and (7) Defendant did not initially tell Ofc. Badker that he was carrying a concealed pistol on his hip.

> It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officer[ ] must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers."

*Id.* (internal citations omitted) (citing *Reid v. Georgia*, 448 U.S. 438, 440–41 (1980); *United States v. Sokolow*, 831 F.2d 1413 (9th Cir. 1987)). However, "conduct which would be wholly

innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection." *Wallraff*, 705 F.2d at 988.

"The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold an otherwise invalid search or seizure." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008). However, this doctrine presumes a degree of communication between officers and that the officers have shared relevant knowledge which informs the decision to deploy a drug dog. *See id.* (judging probable cause upon the basis of the combined knowledge of officers who have shared relevant information). "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop." *United States v. Hensley*, 469 U.S. 221, 232 (1985) (internal citations omitted). In this case, Ofc. Badker was informed by other law enforcement officers that Defendant's vehicle may contain contraband but he was not informed of the underlying reasons for that suspicion. In fact, when asked by the Court if he would have been able to stop the vehicle had Defendant not been speeding, Ofc. Badker said he could not. Lacking specific, articulable facts from the law enforcement officers who had communicated with him, Ofc. Badker would not have had reasonable suspicion to conduct a stop to investigate a crime without the traffic violation. *See United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) ("A traffic stop is reasonable under the Fourth Amendment 'if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation occurred.'") (citing *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). Accordingly, the Court does not find the Government's first factor indicative of reasonable suspicion.

The Court need not grapple long with the Government's second and third factors. "It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *Beck*, 140 F.3d at 1139. Similarly, it is not uncommon for a motorist to try to seek common ground with a law enforcement officer in the hopes of avoiding to pay a fine. The Court can see nothing suspicious about a motorist telling a law enforcement officer that he too, used to be law enforcement. Offering up this information early in a traffic stop does not lead to a reasonable suspicion that criminal activity was afoot. The Court also finds that, though it would likely be considered good practice for someone, especially

a retired law enforcement officer familiar with the dangers inherent in a traffic stop for police officers, to volunteer early in the stop that he is legally carrying a concealed weapon, defendant is not required to do so. Further, when asked whether he had anything on him, Defendant readily volunteered having the pistol on his person and informed the officer he had a permit for it. Finally, when asked by the Court during the hearing, Ofc. Badker admitted that he did not think much about Defendant carrying the pistol at the time.

The Government's fourth factor—that defendant was traveling from California, a known source for narcotics, via a one-way rental vehicle—may similarly be disposed of upon examination of case law. *See Beck*, 140 F.3d 1129, 1137 (holding there was nothing inherently suspicious in defendant's use of a one-way rental vehicle, though rented by a third person). However, unusual travel plans may still provide an indicia of reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 2 (1989) (taking into consideration defendant's travel itinerary as one of several factors which led the Supreme Court to conclude reasonable suspicion supported the decision to search the defendant) ("Thus, although each of these factors is not by itself proof of illegal conduct and is quite consistent with innocent travel, taken together, they amount to reasonable suspicion that criminal conduct was afoot."). Therefore, for purposes of analysis, the Court considers the Government's fourth and fifth factors together, since both involve Defendant's travel itinerary.

Although the Eighth Circuit does not contend that geography is an entirely irrelevant factor, it has found "that the entire state of California, the most populous state in the union, can[not] properly be deemed a source of illegal narcotics such that mere residency in [and travel from] that state constitutes a factor supporting reasonable suspicion." *Beck*, 140 F.3d at 1137. "Innumerable other Americans travel to that state or through there for pleasure or lawful business. Clearly, the vast number of individuals coming from that state must relegate this factor to a relatively insignificant role." *Id.* at 1137–38. Suspicion is further dispelled when defendant drives a rental car and the name matches between the rental agreement and the driver's license. *United States v. Kirkpatrick*, 5 F. Supp.2d 1045, 1050 (D. Neb. 1998). Contrary to the facts in *Beck* and *Kirkpatrick*, however, the Court is wary of defendant's explanation for his trip, as well as his inability to identify his time of departure. Defendant told Ofc. Badker that he had flown out to California to see a couple old friends, and decided to rent a car to get home right away when he found out his dog was sick. He explained that he did not fly home because last minute

flights are prohibitively expensive, but conceded that the one-way rental ended up costing him about as much. When asked when he started driving back, Defendant initially stated he left the previous morning. After second thought, he stated he had left the day before that. The rental agreement, however, provided that the car was rented on September 9th—three days prior. Inconsistent answers regarding details of a trip may support a finding of reasonable suspicion. *See United States v. Lebrun*, 261 F.3d 731, 734 (8th Cir. 2001); *see also Beck*, 140 F.3d at 1139 (citing *United States v. Kopp*, 45 F.3d 1450, 1453 (10th Cir. 1995) (finding reasonable suspicion was sufficiently based on a combination of suspicious travel plans, inconsistent answers, and nervousness)).

The suspiciousness of this behavior increases in light of Defendant's evasive responses to Ofc. Badker's questions regarding weapons. Nervous, evasive behavior has long been recognized as a pertinent factor in determining reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *United States v. Brignoni—Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (per curium); *Sokolow*, 490 U.S. at 8–9). When asked if he had any weapons in the vehicle, Defendant paused before saying, "umm…I don't think so." Ofc. Badker asked if he didn't think so or if he knew there weren't any other weapons in the vehicle, to which Defendant replied, "no, I got my suitcase which is a carry on." When Ofc. Badker pointed out that an officer would normally find the circumstances of the one-way rental from California to South Dakota suspicious, Defendant concurred, saying "the only thing that would be better was if a third party rented it." Then Defendant emphatically stated that there was "no dope in the fricken car though, I can tell you that much." The forceful denial of having any drugs in the vehicle compared to the noncommittal responses to questions regarding weapons, weighs in favor of finding reasonable suspicion.

Accordingly, the Court finds that, taking into account any added meaning certain conduct might suggest to experienced officers, the totality of the circumstances, especially the lack of credibility of the travel plans offered and evasive answers, gives rise to reasonable suspicion to conduct the drug dog sniff.

## PROBABLE CAUSE

Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *United*

*States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). In making a probable cause determination, the Court applies a common sense approach and considers all relevant circumstances. *See id.* at 1179 (quoting *Kennedy*, 427 F.3d at 1141). Further, the Court considers those circumstances "as a whole and in light of the officers' experience and specialized training." *United States v. Simeon*, 115 F. Supp. 3d 981, 999 (N.D. Iowa 2015) (internal citations omitted) (citing *United States v. Ameling*, 328 F.3d 448, 448 (8th Cir. 2003).

"[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010). "The relevant question is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Simeon*, 115 F. Supp. 3d at 999 (citing *Florida v. Harris*, 568 U.S. 237, 248 (2013).

> Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Harris*, 568 U.S. at 246–47. The presumption of general reliability may be overcome if defendant can show the inadequacy of a certification or training program or that "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions. *Id.* at 247; *see also United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015).

Here, there is evidence of Shadow's satisfactory performance in the records of his training, certification, and recertification, which show that he passed, though he is not a star student. He is a "hectic" dog that is hard to handle. That is also illustrated in the video of the incident in question. Shadow is on a leash and he essentially pulls his handler around the Defendant's rental vehicle. In addition, the Government's own expert witness, Sgt. Coltz of the South Dakota Highway Patrol, testified that the arresting handler's alleged use of a reward toy for Shadow would be inappropriate.

The testimony of Sgt. Coltz and that of Defendant's expert, Sgt. Brett Cline of the Hennepin County Sherriff's Office of Minnesota, was that it is appropriate for a dog handler to indicate by motioning by hand where the handler wants the dog to sniff. That was done in this

case. There was no evidence that the handler touched the car to indicate more specifically where the dog should sniff. Testimony indicated that such a touching would be inappropriate.

Shadow was only trained to detect opiates and other drugs. Shadow was not trained to detect gunpowder or guns. No drugs were found in the ensuing search. The government claimed first that the prescription drugs in the prescription drug container in the Defendant's suitcase on the seat of the rental car were the basis for Shadow's alert. The Court rejects that possibility as being too far-fetched. The government's fallback argument was that it was a rental car so maybe some previous renter had drugs in the car. That, too, is merely speculation. However, the fact is that drugs need not have been found if the dog, along with his trainer, is determined to be adequately reliable through training, certification by a bona-fide organization, and periodic re-certification. Although Ofc. Badker, as well as the Government's expert witness, testified that they were unsatisfied with aspects of Shadow's training and performance, Shadow and his handler have maintained certification and undergone some follow-up training. As the Supreme Court observed in *Harris*, "law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." *Harris*, 568 U.S. at 247. Shadow and his handler are adequately reliable, even though Shadow is certainly not an exceptional dog.

So did Shadow alert? The testimony of both experts was that the dog's handler is in the best position to know when the dog's natural behavior changes because that handler is the one who has trained with the dog. Ofc. Badker, Shadow's handler, says Shadow did a "head check" when he turned left around the driver side rear of the car. The video shows a turning of the head to the left as Shadow walks around the corner of the car and was turning to the left. That turn of the head while turning does not look like an alert, but the handler says it is. Next, Shadow sits down and, when he does, he is not focused. He looks to his left while sitting and appears disinterested and continues to appear so. The explanation by the handler for the disinterest is that Shadow's job was over after having made the alert and the subsequent indication on the rear of the car. With a dog that is as aggressive and hard to handle as Shadow is, with a strong prey drive, that explanation strains credulity. But the handler claims that is the reason for Shadow's lack of interest.

10

The Court does not agree and find that Shadow alerted when he turned left at the driver's side rear fender. The Court does not find after numerous reviews of the video that Shadow alerted and then indicated. Most precedent establishes that an alert is enough and that a follow up indication is not necessary. *See United States v. Holleman*, 743 F.3d 1152 (8th Cir. 2014); *United States v. Parada*, 577 F.3d 1275, 1281–82 (10th Cir. 2009); *United States v. Clayton*, 374 Fed.Appx. 497, 500–02 (5th Cir. 2010) (all distinguishing behavior that constitutes an alert form a dog's trained final indication, and finding an alert to be sufficient for probable cause purposes). The Court notes, however, that while it is not true that anything less than a full, final indication is inherently unreliable, "on a spectrum of reliability, a final indication consistent with the K-9's training is at the most reliable end, and other changes of behavior fall somewhere short of that." *United States v. Heald*, 165 F.Supp.3d 765, 778 n. 20 (W.D.Ark. 2015). The dog movement at the front of the car was just an aggressive dog movement. The turning of the head when going around the driver's side rear of the car did not look like an alert. The movements once to the rear of the car were, however, an indication. Shadow is trained only to detect certain drugs. No drugs were found in the subsequent search of the car. How far can the courts go in finding dog authorized searches when nothing is found in the subsequent search? Field results were discounted in Harris in favor of controlled setting certification and recertifications. So can a dog continue to alert or indicate in the field with a series of no results other than a search with nothing found? This is troubling, especially if the Courts fully abdicate to the handler what constitutes an alert and an indication. If so, canine teams become the key to every desired search.

Some discussion of an alert and an indication by drug dogs is warranted. The experts for both parties discussed a drug dog alerting and then indicating. It appears that the courts are sometimes talking about the same act by a dog when talking about an alert or an indication by a dog, using the terms interchangeably. In the testimony in the present case, a distinction was made by both experts between an alert and an indication. The distinction was that an alert is where the dog demonstrates to the handler a change in behavior that shows something of additional interest to the dog. An indication is showing at least to the handler that there is a substance the dog has been trained to detect and where that substance is located. If that distinction is made, an alert does not have to precede an indication, but it can.

Man has been hunting prey with dogs for far longer than dogs have been used to locate drugs or explosives. The dogs used for all of those pursuits are dogs that have hopefully received

good training and have good genetics for the task. We should not ignore to what we can learn from the long and extensive history of hunting dogs. Some hunting dog breeds are pointing dogs, they point to the location of a bird. The handler as well as anyone who can see the dog can tell that the dog is pointing out the location of a bird. Once in a while, even with a good dog, there is a false point. One assumes, but does not know, that there has been a bird there that had vacated the premises before we got there. The same can happen with drug dogs or bomb dogs. But a difference is that with the hunting pointing dog, everyone knows the dog is pointing. The hunting dog point does not depend upon the credibility of the handler to tell us that he knows there is an alert or indication, even though we cannot see the alert or indication from any manifestation from the dog, but the handler knows.

Why should drug dogs be relied upon with an indication any less observable than that of hunting dogs? Drug dogs are doing something far more important than hunting dogs, they are determining who should be detained and searched and who should lose their constitutional right to freedom from unreasonable searches.

The Court recognizes, as the Supreme Court did in *Caballes*, that "[t]he infallible dog . . . is a creature of legal fiction." 543 U.S. at 411 ("Although the Supreme Court of Illinois did not get into the sniffing averages of drug dogs, their supposed infallibility is belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine."). The question then comes down to one of the credibility of the handler. *Clayton, supra* at 502 quoted in *Holleman, supra* at 1156. "Our Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers. So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, the Court will not engage itself in the evaluation of whether that dog should have an alternative means to indicate the presence of the drugs."

The handler in the present case says that he did have a toy on his person when Shadow was doing a sniff search. Having a toy on the handler's person during a dog search is not a good practice according to either party's expert witness. However, the handler denies cueing Shadow to indicate with the toy even though at the scene the Defendant claimed cueing. The Defendant is a former law enforcement canine handler. The toy somehow wound up on the pavement near

where Shadow had been. A trooper that had arrived at the scene is shown in the video picking the toy up off of the shoulder of the road and handing it back to the handler. The handler testified that he did not cue Shadow with the toy and that the toy must have fallen out of his belt where he carried it. The video shows no clear instance of Shadow having the toy in his mouth, nor does it show a clear instance of the handler with the toy in his hand until he throws it in the back of his police car after the Trooper handed him the toy. Further, Shadow can be seen sitting, Shadow's indication behavior, before Ofc. Badker reaches forward toward the vehicle.

Defendant's assertion that, in the alternative, Shadow was cued to indicate when Ofc. Badker stepped around in front of Shadow when they reached the back of the vehicle is contradicted by the fact that Ofc. Badker had also attempted to move around Shadow at the front of the vehicle when Shadow was sniffing intently at the license plate. This did not cause Shadow to sit then. The video does not show the handler touching the rear of the car. The handler is shown pointing at an area at the rear of the car without touching the car. Both experts said that pointing to an area for the dog to sniff was an appropriate act during a dog search. Therefore, without more, it cannot be said that Ofc. Badker cued Shadow to indicate and the presumption of general reliability of Shadow's indication has not been rebutted. Despite the fact that no drugs were found, Shadow, trained and certified in drug detection and found to be generally reliable, had indicated to the rear of Defendant's car. Carrying the analogy between pointing bird dogs and drug dogs further, a pointing dog can be said to be getting "birdy" or showing to those around that there is something of interest to the dog. Likewise, a drug dog is said to alert. A bird dog sometimes, depending upon the situation, will not go through the "birdy" preclude but will immediately go on point Likewise, a drug dog sometimes will not show an alert, but instead will go directly to an indication. In reviewing all of the evidence, that is what the Court concludes in the present case, there was no alert but Shadow did indicate at the rear of the vehicle without being cued by his handler. Because all the facts surrounding the indication, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or other evidence of a crime, there was probable cause to conduct the search of Defendant's vehicle. Accordingly,

IT IS ORDERED that Defendant's Motion to Suppress, Doc. 31, is DENIED.

Dated this 6th day of November, 2017.

BY THE COURT:

*Lawrence Piersol* (signature)
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, Clerk of Courts

BY: _____
Deputy